## *Alpha Iota Omega Christian Fraternity v. Moeser*

United States District Court for the Middle District of North Carolina

May 4, 2006, Decided

CIVIL NO. 1:04CV00765

**Reporter**

2006 U.S. Dist. LEXIS 28065; 2006 WL 1286186

ALPHA IOTA OMEGA CHRISTIAN FRATERNITY, an unincorporated association; TREVOR J. HAMM, an individual; and CARLON D. MYRICK, an individual, Plaintiffs, v. JAMES MOESER, Chancellor of the University of North Carolina at Chapel Hill; RICHARD T. WILLIAMS, Chairman and member, Board of Trustees of the University of North Carolina at Chapel Hill; NELSON SCHWAB III, Vice Chairman and member, Board of Trustees of the University of North Carolina at Chapel Hill; JEAN ALMAND KITCHIN, Secretary and member, Board of Trustees of the University of North Carolina at Chapel Hill; TIMOTHY B. BURNETT; PHILIP G. CARSON; RUSSELL M. CARTER; JOHN G. B. ELLISON, JR.; PAUL FULTON, JR.; KAROL V. MASON; ROGER L. PERRY, SR.; A. DONALD STALLINGS; ROBERT W. WINSTON III; members, Board of Trustees of the University of North Carolina at Chapel Hill; JONATHAN CURTIS, Assistant Director of Student Affairs and Organizations, University of North Carolina at Chapel Hill; MOLLY CORBETT BROAD, President, University of North Carolina; J. BRADLEY WILSON, Chair and member, Board of Governors of the University of North Carolina; J. CRAIG SOUZA, Vice Chairman and member, Board of Governors of the University of North Carolina; PATSY B. PERRY, Secretary and member, Board of Governors of the University of North Carolina; BRADLEY T. ADCOCK; G. IRVIN ALDRIDGE; JAMES G. BABB; BRENT D. BARRINGER; J. ADDISON BELL; R. STEVE BOWDEN; F. EDWARD BROADWELL, JR.; WILLIAM L. BURNS, JR.; ANNE W. GATES; JOHN F.A.V. CECIL; BERT COLLINS; JOHN W. DAVIS III; RAY S. FARRIS; DUDLEY E. FLOOD; HANNAH D. GAGE; WILLIE J. GILCHRIST; H. FRANK GRAINGER; PETER D. HANS; PETER) KEBER; ADELAIDE DANIELS KEY; G. LEROY LAIL; CHARLES H. MERCER, JR.; CHARLES S. NORWOOD; GARY C. OWEN; JIM W. PHILLIPS, JR.; GLADYS ASHE ROBINSON; ESTELLE ″BUNNY″ SANDERS; PRISCILLA P. TAYLOR; ROBERT F. WARWICK, members, Board of Governors of the University of North Carolina; each in their official capacities, Defendants.

## Core Terms

moot, official recognition, parties, student organization, non-discrimination, religious, amend, attorneys', religion, lawsuit, membership, sexual orientation, motion to dismiss, website, costs, scheduling order, nominal damages, leave to amend, amended complaint, motion for leave, reasons, futile, proposed amended complaint, prevailing party, good cause, allegations, officially, rights, standard of conduct, motion to amend

**Counsel:** [*1] For ALPHA IOTA OMEGA CHRISTIAN FRATERNITY, AN UNINCORPORATED ASSOCIATION, TREVOR J. HAMM, AN INDIVIDUAL, CARLON D. MYRICK, AN INDIVIDUAL, Plaintiffs: BENJAMIN W. BULL, JORDAN W. LORENCE, ALLIANCE DEFENSE FUND LAW CENTER, SCOTTSDALE, AZ; DAVID A. FRENCH,

COLUMBIA, TN US; JEFFREY A. SHAFER, ALLIANCE DEFENSE FUND, WASHINGTON, DC; ROBERT MICHAEL SCHMIDT, LAURINBURG, NC.

For JAMES MOESER, CHANCELLOR OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, RICHARD T. WILLIAMS, CHAIRMAN AND MEMBER BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, NELSON SCHWAB, III, VICE CHAIRMAN AND MEMBER, BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, JEAN ALMAND KITCHIN, SECRETARY AND MEMBER, BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, TIMOTHY B. BURNETT, PHILIP G. CARSON, RUSSELL M. CARTER, JOHN B. ELLISON, JR., PAUL FULTON, JR., KAROL V. MASON, ROGER L. PERRY, SR., A. DONALD STALLINGS, ROBERT W. WINSTON, III, MEMBERS, BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, JONATHAN CURTIS, ASSISTANT DIRECTOR OF STUDENT AFFAIRS AND ORGANIZATIONS, UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, MOLLY CORBETT BROAD, PRESIDENT, [*2] UNIVERSITY OF NORTH CAROLINA, J. BRADLEY WILSON, CHAIR AND MEMBER, BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA, J. CRAIG SOUZA, VICE CHAIRMAN AND MEMBER, BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA, PATSY B. PERRY, SECRETARY AND MEMBER, BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA, BRADLEY T. ADCOCK, G. IRVIN ALDRIDGE, JAMES G. BABB, BRENT D. BARRINGER, J. ADDISON BELL, R. STEVE BOWDEN, F. EDWARD BROADWELL, JR., WILLIAM L. BURNS, JR., ANNE W. CATES, JOHN F.A.V. CECIL, JOHN W. DAVIS, III, RAY S. FARRIS, DUDLEY E. FLOOD, HANNAH D. GAGE, WILLIE J. GILCHRIST, H. FRANK GRAINGER, PETER D. HANS, PETER KEBER, ADELAIDE DANIELS KEY, G. LEROY LAIL, CHARLES H. MERCER, JR., CARY C. OWEN, JIM W. PHILLIPS, JR., GLADYS ASHE ROBINSON, ESTELLE "BUNNY&quo SANDERS, PRISCILLA P. TAYLOR, ROBERT F. WARWICK, MEMBERS, BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA; EACH IN THEIR OFFICIAL CAPACITIES, BERT COLLINS, ALL DEFENDANTS, Defendants: JOHN P. SCHERER, II, THOMAS J. ZIKO, N. C. DEPARTMENT OF JUSTICE, EDUCATION AND CORRECTION, RALEIGH, NC.

For RICHARD T. WILLIAMS, CHAIRMAN AND MEMBER, BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, Defendant: [*3] JOHN P. SCHERER, II, N. C. DEPARTMENT OF JUSTICE, EDUCATION AND CORRECTION, RALEIGH, NC.

**Judges:** Frank W. Bullock, Jr., United States District Judge.

**Opinion by:** Frank W. Bullock, Jr.

# Opinion

MEMORANDUM OPINION

BULLOCK, District Judge

This matter is before the court on Defendants' Second Motion to Dismiss Complaint and Suggestion of Mootness (filed May 25, 2005) and Plaintiffs' Motion for Leave to File Amended Complaint (filed June 20, 2005). For the reasons set forth below, Defendants' motion will be granted and Plaintiffs' motion will be denied.

FACTS

Plaintiff Alpha Iota Omega Christian Fraternity ("AIO") is an unincorporated student organization at the University of North Carolina at Chapel Hill ("UNC-CH"), which is one of several universities in the publicly-funded University of North Carolina system. The individual Plaintiffs, Trevor J. Hamm and Carlon D. Myrick, are [1] UNC-CH students and members or officers of AIO. Plaintiffs' goal is to "uphold the Great Commission of Jesus Christ by serving members of Greek letter organizations through evangelism and mentorship." (Compl. P64.) AIO is governed by a constitution, by-laws, and a statement of faith.

 [*4]  Defendant James Moeser is the Chancellor of UNC-CH. The other Defendants are the Assistant Director of Student Affairs and Organizations at UNC-CH, members of UNC-CH's Board of Trustees, and officers and members of the Board of Governors of the University of North Carolina. Each of the Defendants is sued in his or her official capacity only. (Compl. P59.)

UNC-CH requires student organizations to apply for official recognition on an annual basis in order to receive certain benefits such as funding, inclusion in university publications, use of the UNC-CH name, and the right to reserve campus facilities and equipment. (Compl. P81.) Until recent changes, which will be addressed below, UNC-CH required all officially recognized student organizations to agree that membership "be open without regard to age, race, color, national origin, religion, disability, veteran status, or sexual orientation." (Compl. P85.) Student organizations that did not agree to the non-discrimination policy

would be permitted to exist on campus, but would not be officially recognized by the university.

AIO was an officially recognized student organization for "a number of years" (and had agreed to the non-discrimination [*5]  policy) prior to September 2003. (Compl. P96.) In September 2003, AIO notified UNC-CH that it would no longer agree to the non-discrimination policy "to the extent those policies conflicted with the requirement that all AIO members and officers adhere to a Christian statement of faith, adhere to tenets of belief, and conform to certain standards of conduct." (Compl. P99.) Plaintiffs objected to the portions of the non-discrimination policy concerning religion and sexual orientation. [2] [*6]  They argued that they should not have to agree to admit all applicants, regardless of their religion or sexual orientation, because persons of certain religions and certain sexual orientations hold beliefs, pursue goals, and maintain standards of conduct that necessarily conflict with AIO's beliefs, goals, and standards of conduct. [3] Plaintiffs say that if they were required to admit persons of all religions and sexual orientations "it would contradict AIO's expressive and associational purpose" of "promoting the Christian faith to men belonging to fraternities at UNC-CH." (Compl. PP68, 72.)

According to Plaintiffs, after their refusal to agree to the non-discrimination policy, UNC-CH

---

[1]  The individual Plaintiffs' status as full-time undergraduate students may have changed since the complaint was filed. <u>See</u> n. 21, <u>infra.</u>

[2]  Plaintiffs do not object to the provisions forbidding discrimination on the basis of age, race, color, national origin, disability, or veteran status. (Compl. P108 & Ex. 2, Sec. 1(a).)

[3]  The standards contained in AIO's governing documents cannot be set forth here in their entirety. Among them are: "Individuals that aspire to be members of AIO must swear to live their lives in a way that is holy and acceptable to GOD by the grace and empowerment of our Lord Jesus Christ and His Holy Spirit." (Compl. Ex. 3, p. 5.) "Among AIO'S Christian standards Of conduct is the belief that Christian standards of conduct limit sexual conduct to that which takes place in a marriage between one man and one woman." (Compl. P73.) "Accordingly, individuals who engage in sexual conduct outside of marriage, whether heterosexual or homosexual, are not permitted to be members or officers of AIO." (Compl. P75.)

Page 4 of 16
2006 U.S. Dist. LEXIS 28065, *6

withdrew AIO's official recognition, [4] removed AIO's information from the university website, and froze AIO's student activities fund account. [5] (Compl. PP101-04.) Despite lack of official recognition, AIO was still included in the UNC-CH 2004 Greek Life recruitment book and on the UNC-CH Greek [*7] affairs website. Plaintiffs continued to pursue their goals on campus, maintain AIO's website (which was advertised by UNC-CH in its publications and on its website), reserve meeting space at the university, and access AIO's student activities fund account. (Donald E. Luse Aff. PP3-5, 15-17; Deborah Horne Aff. PP2-6; Jonathan Curtis Aff. PP12-16, Nov. 15, 2004.) AIO never requested student activity fee funding, even when it was an officially recognized organization. (Horne Aff. P7.)

In their lawsuit, filed August 25, 2004, Plaintiffs seek [*8] official recognition at UNC-CH, free from those provisions of the non-discrimination policy which require AIO to be open to all interested students regardless of religion or sexual orientation. (Compl. P106.) Plaintiffs invoke their constitutional rights to form a group with persons who share their beliefs and to practice and evangelize their religion on campus as "secured by the _First_ and _Fourteenth Amendments to the Constitution_." (Compl. PP114, 120, 125.) They allege that their religious beliefs, goals and purpose fundamentally conflict with those held by persons of certain religions and sexual orientations. Thus, Plaintiffs conclude that the provisions of the non-discrimination policy that require AIO to be

open to all religions and sexual orientations violate their constitutional rights to "freedom of association for expressive purposes," "freedom of speech," and "free exercise of their religion." (Id.)

Plaintiffs pray for a preliminary and permanent injunction forbidding Defendants from applying the non-discrimination policy to AIO and a declaratory judgment that the non-discrimination policy is either facially unconstitutional or unconstitutional as applied. (Compl. 21.) [*9] Other than this equitable relief, the complaint seeks only attorneys' fees and costs. No compensatory or nominal damages are sought. [6]

When Plaintiffs pursued their motion for a preliminary injunction (briefed in November 2004 and heard in February 2005) they argued, and this court agreed, that there is a significant difference between discriminating on the basis of one's _beliefs_ (which is permitted) and one's _status_ (which is not permitted). (Pls.' Reply Br. in Supp. Mot. for Prelim. Inj. 3-5. [7] ) Because the non-discrimination policy, on its face, may have prohibited the exclusion of potential members on _either_ basis, the court was satisfied that application of the policy (as written, although perhaps not as interpreted by the university) to Plaintiffs would violate their rights as guaranteed by the _First_ and _Fourteenth Amendments_ [*10] . In order to protect Plaintiffs' constitutional rights and to allow Defendants time to revise or clarify the policy, this court entered an Order and Preliminary Injunction on March 2, 2005. That Order enjoined

[4]  More accurately, AIO was denied official recognition for the 2003-04 academic year, per the annual application process. (Donald E. Luse Aff. PP9, 10, 12.) Plaintiffs did not apply for official recognition for 2004-05.

[5]  Defendants deny that AIO's account was ever "frozen" and assert that, even when AIO was not officially recognized, it was free to withdraw its funds at any time and that AIO did in fact use the account in the spring of 2004. (Deborah Horne Aff. PP2-6.)

[6]  Although the title of the pleading is "Verified Complaint for Injunctive and Declaratory Relief and Nominal Damages," the complaint does not state a claim for nominal damages.

[7]  In briefs and during oral argument on the pending motions, Plaintiffs' new counsel attempted to discredit the distinction made by Plaintiffs' original counsel and called it "incoherent." New counsel claimed that one "cannot separate status from belief." (See also Pls.'s Mem. in Reply to Defs.' Opp'n to Leave to File Am. Complaint 17.) The court disagrees and maintains that Plaintiffs' earlier argument was correct; although beliefs and status often overlap, they are "two distinct concepts -- religion as a set of beliefs and religion as a status." (Pls.' Reply Br. in Supp. of Mot. for Prelim. Inj. 3.)

Defendants from applying the non-discrimination policy "to prohibit Plaintiffs from limiting membership and participation in their organization to students who, upon individual inquiry, affirm that they support Plaintiffs' goals, agree with Plaintiffs' beliefs, and agree to conform their behavior to Plaintiffs' tenets and standards of conduct." The Order ensured that AIO would be treated like non-religious student organizations at UNC-CH, in that they too could limit membership to those who shared their beliefs and would support their goals.

[*11] There have been two important developments since the March 2, 2005 Order: (1) on May 23, 2005, UNC-CH published a statement entitled "Official Recognition of Student Organizations - Non-Discrimination Policy," which offered official recognition to "student organizations that select their members on the basis of commitment to a set of beliefs," [8] and (2) in September 2005, Plaintiffs applied for and received official recognition, entitling them to full and equal privileges at UNC-CH for the 2005-06 academic year. (James Moeser Aff. PP6 & 7, May 25, 2005; Jonathan E. Curtis Aff. P3, March 7, 2006 ("Second Curtis Aff.").) Thus, AIO is currently enjoying the benefits of official

recognition, including having money in a student activities fund account, reserving meeting space in the student union, and being listed on the university's website. (Second Curtis Aff. PP4-6.)

[*12] On May 25, 2005, Defendants filed their Second Motion to Dismiss Complaint and Suggestion of Mootness, arguing that the recent developments resolved Plaintiffs' claims and mooted the case. Plaintiffs opposed Defendants' motion and, after the deadline to file such motions, filed a Motion for Leave to File Amended Complaint. [9] For the reasons set forth below, Defendants' motion will be granted and Plaintiffs' motion will be denied.

DISCUSSION

I. Motion to Dismiss Will Be Granted

This court has jurisdiction to adjudicate actual cases and controversies only. *U.S. Const. art. III, § 1 et seq.*; *Powell v. McCormack, 395 U.S. 486, 496-97, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969)*. In order to maintain jurisdiction, "an actual controversy must be extant at all stages of [*13] review, not merely at the time the complaint is filed." *Arizonans for Official English v. Ariz., 520*

---

[8] The May 2005 statement reads, in pertinent part:

To be eligible for official recognition from the University -- and the privileges that accompany official recognition -- a student co-curricular organization must abide by the following:

1. Membership and participation in the organization must be open to all students without regard to age, race, color, national origin, disability, religious status or historic religious affiliation, veteran status, or sexual orientation. Membership and participation in the organization must also be open without regard to gender, unless exempt under Title IX.

2. Student organizations that select their members on the basis of commitment to a set of beliefs (e.g., religious or political beliefs) may limit membership and participation in the organization to students who, upon individual inquiry, affirm that they support the organization's goals and agree with its beliefs, so long as no student is excluded from membership or participation on the basis of his or her age, race, color, national origin, disability, religious status or historic religious affiliation, veteran status, sexual orientation or, unless exempt under Title IX, gender.

Defendants do not agree that this statement is new or different from the policy it published and/or applied to student organizations in 2003. They refer to it as a clarification or an interpretation of the prior policy. (Defs.' Mem. 1.) The court declines to characterize the May 2005 statement and will instead refer to it as "the 2005 Policy" and will refer to the policy as it was written at the commencement of this suit as "the 2003 Policy."

[9] Plaintiffs' motion to amend was filed on June 20, 2005, after the June 9, 2005 deadline set in the parties' Joint Rule 26(f) Report and the court's order approving that report. (See Report P5(b); Order Approving Joint Rule 26(f) Report, May 5, 2005.)

*U.S. 43, 67, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997)*. A case becomes moot when the issues presented are no longer "live" or when the parties no longer hold a personal stake or cognizable interest in the outcome. *Powell, 395 U.S. at 496-97*. When a case becomes moot, the court must dismiss for lack of subject matter jurisdiction. *United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980)*.

Despite the resolution of all issues between the parties in this case and the relative success for Plaintiffs, Plaintiffs are not satisfied. They oppose Defendants' Second Motion to Dismiss and Suggestion of Mootness and do not accept Defendants' voluntary change in policy and grant of official recognition to AIO as a resolution of the case. In order to avoid mootness, Plaintiffs first argue that Defendants' "litigation-provoked change" in policy does not moot the case because the university could easily revert to the old policy. Second, Plaintiffs contend that the case is not moot because they filed a motion for leave to amend the complaint, which will be addressed in part II of this opinion.

[*14]   A. The Defendants' Voluntary Actions Moot the Case

In *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc., 528 U.S. 167, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)*, the Supreme Court held '"[a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' The 'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party, asserting mootness." *Id. at 189* (citations omitted). Thus, before finding that this case is mooted by Defendants' voluntary issuance of the 2005 Policy and granting of official recognition to AIO, it is

the court's obligation to be sure that Defendants cannot reasonably be expected to revert to the 2003 Policy.

It is true that, although the 2005 Policy was posted on the main university website as soon as it was announced in May 2005, UNC-CH did not immediately update all of its web-pages, links and templates to reflect the 2005 Policy. [10] It was during this time of flux when some pages were updated, but others were not (the summer of 2005), when Plaintiffs filed their Opposition to Defendants' [*15] Second Motion to Dismiss and Suggestion of Mootness ("Pls.' Opp'n"). Plaintiffs argued then that the inconsistencies, in conjunction with UNC-CH's habit of changing its interpretation of the 2003 Policy, showed that "it is not 'absolutely clear' that the University would stick with its updated policy, nor is there anything therein that would preclude it from abandoning its latest terminology once this case would be dismissed." (Pls.' Opp'n 5.) Plaintiffs urged the court to retain jurisdiction in order to rule on the unconstitutionality of the 2003 Policy and to enjoin Defendants from applying it to Plaintiffs.

However, even if Plaintiffs' concerns were valid as of the summer of 2005 (which the court does not decide), the current situation is very different. The court takes judicial notice that all relevant UNC-CH [*16] websites, links, applications and templates for student organizations now contain the 2005 Policy only. *Fed. R. Evid. 201(b)(2)* & *201(f)*. The 2003 non-discrimination policy, about which Plaintiffs brought suit, is now gone. Defendants have made the 2005 Policy as public and as permanent as possible and Plaintiffs are officially recognized for the 2005-06 academic year. Defendants have done much more than merely "promise not to commit similar violations in the future." *United States v. W. T. Grant Co., 345 U.S. 629, 634, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)*. They have changed the policy and have

---

[10]   UNC-CH maintains two main websites that are relevant here, www.unc.edu and www.carolinaunion.com, each containing several statements of and/or links to the university's non-discrimination policy.

granted AIO official recognition under the 2005 Policy. There is no "reasonable expectation that the same complaining party would be subjected to the same action again," *Murphy v. Hunt, 455 U.S. 478, 482, 102 S. Ct. 1181, 71 L. Ed. 2d 353 (1982)*, and the possibility that another person may suffer harm in the future is insufficient to avoid mootness. *Weinstein v. Bradford, 423 U.S. 147, 149, 96 S. Ct. 347, 46 L. Ed. 2d 350 (1975)*. "The purpose of an injunction is to prevent future violations." *W. T. Grant, 345 U.S. at 633*. To be entitled to an injunction [*17] Plaintiffs would have to show that such relief is still needed by showing "some cognizable danger of recurrent violation, something more than the mere possibility." Id.

Although there is a remote possibility that Defendants could be acting in bad faith and could, as soon as the lawsuit is ended, change all of the forms and websites back to the 2003 Policy and revoke AIO's official recognition, the court believes that such a development is unlikely and that Defendants can and should be trusted to abide by the 2005 Policy. [11] Defendants have met their burden of persuasion and this case must be dismissed. See *Princeton Univ. v. Schmid. 455 U.S. 100, 103, 102 S. Ct. 867, 70 L. Ed. 2d 855 (1982)* (per curiam) (when university substantially amended the regulation which plaintiff claimed violated his constitutional rights, "the issue of the validity of the old regulation is moot, for this case has 'lost its character as a present, live controversy

of the kind that must exist if we are to avoid advisory opinions on abstract questions of law.'") (quoting *Hall v. Beals, 396 U.S. 45, 48, 90 S. Ct. 200, 24 L. Ed. 2d 214 (1969))*; *Murphy, 455 U.S. at 484*; *Weinstein, 423 U.S. at 149*; *W. T. Grant, 345 U.S. at 635*. [*18]

B. The 2005 Policy Protects the Rights of the Parties

There is no merit to Plaintiffs' contention that "the policy has not been changed in a manner that rescues it from unconstitutionality." (Pls.' Opp'n 2.) On the contrary, the court finds that the 2005 Policy (quoted in footnote 8, supra) is an acceptable and thoughtful balance of the interests of the Defendants to foster diversity, safeguard academic freedom, encourage intellectual discourse, and discourage discrimination and disruption at UNC-CH, on the one hand, with the interests of Plaintiffs to organize with like-minded students to participate in an evangelical [*19] Christian student organization on campus, on the other hand.

The 2005 Policy incorporates Plaintiffs' own request that a distinction be made between a prospective member's religious beliefs (which is a permissible grounds on which to grant or deny membership) and a prospective member's religious status (which is not a permissible ground on which to grant or deny membership). [12] [*21] The 2005 Policy makes clear that AIO (and all other

---

[11]  See, e.g., United States v. Or. State Med. Soc'y, 343 U.S. 326, 334, 72 S. Ct. 690, 96 L. Ed. 978 (1952) (finding "not the slightest reason to doubt the genuineness, good faith or permanence of the changed attitude and strategy of these defendant-appellees," as evidenced by "an overt and visible reversal of policy, carried out by extensive operations which have every appearance of being permanent").

[12]  See Pls.' Reply Br. in Supp. Mot. for Prelim. Inj. 3; see also Healy v. James, 408 U.S. 169, 181, 92 S. Ct. 2338, 33 L. Ed. 2d 266 (1972) ("Among the rights protected by the **First Amendment** is the right of individuals to associate to further their personal beliefs."); Gay Alliance of Students v. Matthews, 544 F.2d 162, 165 (4th Cir. 1976) (the **First Amendment** right of individuals to "associate to further their personal beliefs" "is furthered if those who may wish to join GAS are encouraged by the fact of [official recognition] to take that step"); Seabourn v. Coronado Area Council, Boy Scouts of Am., 257 Kan. 178, 891 P.2d 385 (Kan. 1995) (scouts may exclude from position of leadership an atheist who was unwilling to profess a belief in a supreme being), cited with approval in BSA v. Dale, 530 U.S. 640, 653-54, 657 n.3, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000) (an "expressive organization" has a **First Amendment** right to exclude persons whose message and conduct would "propound a point of view contrary to its beliefs," but may not "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message").

student organizations at UNC-CH) may exclude persons who do not agree with the goals and beliefs of the organization. That is the right Plaintiffs sought in their lawsuit and they have. it now. [13] The 2005 Policy also makes clear, as it should, that student organizations that select their members on the basis of commitment to a set of beliefs, must ask prospective members individually about their commitment to the organization's beliefs and goals, must honor a person's honest responses to such questions, and may not pre-judge any applicant based on his reputation, status, appearance, or heritage. [14] [*22] To the extent Plaintiffs would suggest that they have a constitutional right to pre-judge prospective members based on any of these "status" indicators, [*20] they are wrong and the court rejects that position. [15] *BSA v. Dale, 530 U.S. 640, 653, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000)* (organization may not "erect a shield against anti-discrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message").

In addition to what the 2005 Policy says about Plaintiffs' rights and responsibilities, it also properly sets forth the rights and responsibilities of Defendants. UNC-CH must grant official recognition to students who wish to organize with others who share their beliefs in pursuit of common goals, even if the university disagrees with those beliefs and goals. *Healy v. James, 408 U.S. 169, 187, 92 S. Ct. 2338, 33 L. Ed. 2d 266 (1972)* (under the *First Amendment*, "mere disagreement of the [college] President with the group's philosophy affords no reason to deny it recognition"). UNC-CH may not force its student groups [*23] to espouse the same anti-discrimination message that the university has adopted for itself. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 579, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995)* ("While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government."). [16] The university may still pursue its goals of discouraging discrimination, encouraging diversity, and fostering the free exchange of ideas by recognizing student groups that support various religious beliefs and contrasting views concerning homosexuality. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 233, 120 S. Ct. 1346, 146 L. Ed. 2d 193*

---

[13] "AIO desires official recognition" and seeks permission to enforce its by-laws which provide that "due to the explicit Christian purposes and tenets on which this organization is founded, members shall be selected according to standards set by the organization, in accordance with the statement of faith." (Compl. PP67, 105.)

[14] The court offered this theoretical example at oral argument: A student who Plaintiffs have known to be a member of the Jewish community applies for membership in AIO. Plaintiffs are not permitted to exclude that person indiscriminately, based on assumptions about his beliefs and behaviors. Instead, the 2005 Policy requires Plaintiffs to ask that student whether he can affirm that he "supports the organization's goals" and "agrees with its beliefs." If he answers "yes" (assuming the answer is given honestly), that person cannot be excluded because of his "religious status or historic religious affiliation," i.e., he cannot be excluded simply because he may be Jewish. Once admitted, he may thereafter be held to AIO's standards of conduct and internal rules. If he answers "no," Plaintiffs may exclude him on that basis. Exclusion in that case is permitted under the 2005 Policy because it is not "on the basis of his religious status or historic religious affiliation," but on the basis of his inability or unwillingness to support AIO's goals and agree with its beliefs.

[15] The prayer for judgment states that Plaintiffs seek the right to "discriminate on the basis of religion or sexual orientation." (Compl. 21.) Plaintiffs have made it clear during briefing and oral arguments that what they mean by that is that they seek the right to limit membership to those persons who agree with Plaintiffs' beliefs and will support AIO's goals. Plaintiffs do not wish to summarily refuse someone whose beliefs and commitments align with theirs, regardless of that person's label.

[16] However, UNC-CH is not required to recognize all applicants. It could refuse to recognize a student group that acted unlawfully and posed a threat of material disruption to the campus, or a group that refused to adhere to reasonable regulations concerning the time, place and manner in which student groups must exercise their free speech rights. *Healy, 408 U.S. at 189, 192-93.* Those factors are not present here.

*(2000)* ("The University may determine that its mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside of the lecture hall.") The key is that the university must protect all students' *First Amendment* rights by maintaining **[\*24]** "viewpoint neutrality in the allocation of funding support" and "may not prefer some viewpoints to others." Id.; see also *Rosenberger v. Rector and Visitors of. Univ. of Va., 515 U.S. 819, 828-29, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995)*. In other words, UNC-CH must allow all student organizations to limit membership according to shared beliefs and common goals, regardless of whether they are social, religious or political, and regardless of whether they are in line with the university's beliefs and goals. [17]

**[\*25]** Thus, because the 2005 Policy strikes the right balance between the competing rights and responsibilities of the parties, it is consistent with the Supreme Court's directive that:

> *First Amendment* rights must always be applied "in light of the special characteristics of the . . . environment" in the particular case. And, where state-operated educational institutions are involved, this Court has long recognized "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Yet, the precedents of this Court leave no room for the view that, because of the acknowledged need for order. *First Amendment* protections should apply with less force on college campuses than in the

community at large. Quite to the contrary, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." The college classroom with its surrounding environs is peculiarly the "marketplace of ideas," and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom.

*Healy, 408 U.S. at 180-81* **[\*26]** (citations omitted).; Plaintiffs' inexplicable inability or refusal to understand the 2005 Policy does not require the continuation of a moot case. [18]

The court must consider the claims that were asserted (not what might have been asserted) when deciding whether a live case or controversy exists. In this case, Plaintiffs asked for equitable relief which has either been voluntarily granted by Defendants (freedom from application of the 2003 Policy) or rendered moot by the changed circumstances (a declaratory judgment that the 2003 Policy is unconstitutional). The 2003 Policy is no longer the policy of UNC-CH. It cannot threaten or harm Plaintiffs and this court would be engaging in purely advisory, theoretical analysis **[\*27]** if it were to enter a declaratory judgment on the constitutionality of a non-existent policy. *Lewis v. Continental Bank Corp., 494 U.S. 472, 479, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)* ("Even in order to pursue the declaratory and injunctive claims . . . Continental must establish that it has a 'specific live grievance' against the application of the statutes . . . and not just an 'abstract disagreement' over the constitutionality of such application.") (citations omitted).

---

[17]   This is subject, of course, to reasonable restrictions, as discussed in footnote 16, *supra*. See also *United States v. Albertini, 472 U.S. 675, 687-88, 105 S. Ct. 2897, 86 L. Ed. 2d 536 (1985)* ("Application of a facially neutral regulation that incidentally burdens speech satisfies the *First Amendment* if it 'furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged *First Amendment* freedoms is no greater than is essential to the furtherance of that interest.'") (quoting *United States v. O'Brien, 391 U.S. 367, 377, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968)*).

[18]   Plaintiffs call the 2005 Policy "utterly confounding," "circular and inexplicable." (Pls.' Mem. in Reply to Defs.' Opp'n to Leave to File Am. Compl. 16-17.) However, Plaintiffs argued in favor of the distinction between belief and status, before they argued against it. See n. 7, supra.

Given AIO's current status as an officially recognized student organization and Defendants' adoption of the 2005 Policy, the court is unable to find a current case or controversy between the parties. [19] In the words of the Supreme Court:

[*28]

Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. To invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision. Article III denies federal courts the power "to decide questions that cannot affect the rights of litigants in the case before them," and confines them to resolving "real and substantial controversies admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

*Lewis, 494 U.S. at 477* (citations omitted). Accordingly, Defendants' Second Motion to Dismiss and Suggestion of Mootness will be granted and Plaintiffs' claims will be dismissed.

II. <u>Motion for Leave to File Amended Complaint Will Be Denied</u>

In an effort to avoid mootness. Plaintiffs request leave to amend the complaint pursuant to Rule 15(a), Fed. R. Civ. P. Plaintiffs' position is that they should be [*29] allowed to amend their complaint, almost as a matter of course, [20] and thereby avoid mootness by raising new issues and damages claims.

Plaintiffs' proposed amendments fall into four main topics: (1) the pre-litigation actions of university officials who allegedly enforced the 2003 non-discrimination policy inconsistently, without changing the text of the policy (Proposed Am. Compl. PP42-85), (2) Defendants' failure to completely replace the 2003 Policy with the 2005 Policy in its guidelines, template forms and websites (<u>id.</u> at PP33-41, 90), (3) the alleged vagueness of the 2005 Policy (<u>id.</u> at P89), and (4) a claim for nominal damages (<u>id.</u> at P121.). [21]

[*30] "A party who requests leave to amend after the date specified in the initial scheduling order

19  Plaintiffs made no claim for monetary damages for any alleged past injury. Although Plaintiffs sought recovery of their costs, expenses, and attorneys' fees under 42 U.S.C. § 1988(b), that claim fails for the reasons set forth in Part III, <u>infra</u>. Even if Plaintiffs had a valid claim for attorneys' fees, it would be insufficient to create an Article III case or controversy and dismissal would still be appropriate. <u>Lewis, 494 U.S. at 480</u> ("Where on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary judicial pronouncements on even constitutional issues obtained, solely in order to obtain reimbursement of sunk costs."); <u>Diamond v. Charles, 476 U.S. 54, 70-71, 106 S. Ct. 1697, 90 L. Ed. 2d 48 (1986)</u> (appellate court lacked jurisdiction and suit challenging constitutionality of state statute must be dismissed when only remaining issue concerned attorney's fees because the "fee award is wholly unrelated to the subject matter of the litigation, and bears no relation to the statute whose constitutionality is at issue here. It is true that, were the Court to resolve the case on the merits against appellees, appellees would no longer be 'prevailing parties' entitled to an award of fees under 42 U.S.C. § 1988. But the mere fact that continued adjudication would provide a remedy for an injury that is only a byproduct of the suit itself does not mean that the injury is cognizable under Art. III.").

20  In response to Defendants' Second Motion to Dismiss and Suggestion of Mootness, Plaintiffs assert "because an amended complaint has been filed by Plaintiffs, little else need be considered in this matter." (Pls.' Opp'n 2.)

21  In addition to these amendments. Plaintiffs also seek to make changes to their names and status at UNC-CH. The proposed amended complaint changes the entity bringing this suit from "Alpha Iota Omega Christian Fraternity, an unincorporated association" and "student organization of the University of North Carolina at Chapel Hill" (Compl. P9), to "Alpha Iota Omega Christian Fraternity, <u>Inc.,</u>" a "<u>national</u> men's fraternity organization," having its own "constitution, bylaws and statement of faith" which bind and govern its "local chapters," such as the AIO-chapter at UNC-CH, which is known as the "Alpha Chapter." (Proposed Am. Compl. P3) (emphasis added). The proposed amended complaint omits the allegation that the individual Plaintiffs are "all full-time, registered students at the UNC-CH." <u>Compare</u> Compl. PP61-63 <u>with</u> Proposed Am. Compl. PP4, 5, & 12. UNC-CH requires that all officers and the majority of the members

must satisfy two prerequisites. The party must first demonstrate that there is some 'good cause' why the court should not adhere to the dates specified in the scheduling order. If the party shows 'good cause' to the court's satisfaction, the party must then demonstrate that leave to amend is proper under Federal Rule of Civil Procedure 15." *Forstmann v. Culp, 114 F.R.D. 83, 85 (M.D.N.C. 1987)*. Thus, Plaintiffs are faced with two hurdles in this case.

First, Rule 16(b) requires that parties abide by the filing deadlines set forth in the scheduling order, which "shall not be modified except upon a showing of good cause and by leave" of court. Fed. R. Civ. P. 16(b). Plaintiffs do not address the fact that their motion to amend was filed beyond the deadline, in violation of Rule 16(b), and do not even attempt to show "good cause" to revise the scheduling order.

Second, Plaintiffs must also demonstrate that leave to amend is proper under the more-lenient, general Rule 15 (a), which provides that [*31] leave to amend pleadings "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Even under the more-lenient rule, however, amendments are not always allowed. *Lewis v. Microsoft Corp., 410 F. Supp. 2d 432, 438 (E.D.N.C. 2006)* (citing *Glick v. Koenig, 766 F.2d 265, 268-69 (7th Cir. 1985)* ("The liberal amendment rules under Rule 15(a) do not require the courts to indulge in futile gestures.")); *Forstmann, 114 F.R.D. at 86* ("The text of Rule 15 makes it clear that a court is not to grant permission to amend automatically."). Valid reasons to deny leave to amend include futility, waste of judicial resources, undue delay, and unfair prejudice to the non-moving party. *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*; *Davis v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir. 1980)*.

In this case, the tardiness of the proposed amendment, its futility, and the unfair prejudice to Defendants and overall inefficiency which would result from its allowance, require that leave to amend be denied.

A. Motion Does Not Satisfy Requirements of Rule 16(b)

Plaintiffs' [*32] Motion for Leave to File Amended Complaint was filed after the deadline set by the parties' Joint Rule 26(f) Report and the court's scheduling order. Accordingly, Plaintiffs must first meet the higher standard of "good cause" necessary to revise a scheduling order deadline under Rule 16(b), before the court should even consider the more-lenient standard of Rule 15, which applies to timely motions. Fed. R. Civ. P. 16(b); *Interstate Narrow Fabrics, Inc. v. Century USA, Inc., 218 F.R.D. 455, 460 (M.D.N.C. 2003)*; *Forstmann, 114 F.R.D. at 85*.

Plaintiffs completely ignore the scheduling order and do not attempt to justify their tardiness. Instead, they assume that grounds sufficient under Rule 15 satisfy Rule 16 as well. Plaintiffs are wrong. "The scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Forstmann, 114 F.R.D. at 85* (citation omitted).

Defendants announced the 2005 Policy on May 23, 2005, and filed the Second Motion to Dismiss and Suggestion of Mootness on May 25, 2005.

---

of student organizations be registered, full-time students. (Compl. Ex. 4.) In addition, the proposed amended complaint was filed before, and therefore does not address the fact that, AIO applied for and was granted official recognition for the 2005-06 academic year. Instead, it alleges that the denial of Plaintiffs' rights is ongoing. (Proposed Am. Compl. PP99, 104, 111.) For these reasons, all or some of the Plaintiffs may no longer be proper parties to bring the claims. See *DeFunis v. Odegaard, 416 U.S. 312, 316-17, 94 S. Ct. 1704, 40 L. Ed. 2d 164 (1974)* (non-class-action challenge to constitutionality of school admissions process mooted when plaintiff, admitted pursuant to preliminary injunction, neared graduation and defendant conceded that plaintiff would be allowed to finish); *Steele v. Van Buren Pub. Sch. Dist., 845 F.2d 1492, 1495 (8th Cir. 1988)* (student's claim against school district mooted by her graduation); *Case v. Unified Sch. Dist. No. 233, 908 F. Supp. 864, 873 (D. Kan. 1995)* (former students no longer had cognizable interest in claim seeking injunction to compel school to reinstate books removed from library).

    
Plaintiffs could and should have filed [*33] their motion to amend on time -- by June 9, 2005. [22] Their delay, absent a showing of "good cause" as required by Rule 16(b), constitutes sufficient grounds on which to disallow the motion, even without reaching the arguments raised in Plaintiffs' briefs. Fed. R. Civ. P. 16; *Intown Props. Mgmt., Inc. v. Wheaton Van Lines, Inc., 271 F.3d 164, 166-67 (4th Cir. 2001)* ("district court clearly did not abuse its discretion in denying Intown's late-filed motion to amend"); *Wildauer v. Frederick County, 993 F.2d 369, 372 (4th Cir. 1993)* (district court did not abuse its discretion in denying motion to amend filed after scheduling order deadline); *Blundell v. Wake Forest Univ. Baptist Med. Ctr., 2006 U.S. Dist. LEXIS 11713, 2006 WL 694630, *2 (M.D.N.C. Mar. 15, 2006)* (failure to comply with scheduling order sufficient grounds on which to deny leave to file amended complaint); *DeWitt v. Hutchins, 309 F. Supp. 2d 743, 748 (M.D.N.C. 2004)* ("good cause is not shown if the amendment could have been timely made"); *Forstmann, 114 F.R.D. at 85* (plaintiff's failure to show good cause for untimely motion [*34] to amend "clearly fails to satisfy the first prerequisite").

B. Futility

Even a timely-filed motion to amend should be denied if it is futile. *Foman, 371 U.S. at 182.* An amendment is futile when it could not withstand a motion to dismiss or is legally insufficient. *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross, 101 F.3d 1005, 1011-12 (4th Cir. 1996)*

(proposed amendment was futile because allowing it would have "at most, delayed the inevitable dismissal" of the plaintiff's claims); *Perkins v. U.S., 55 F.3d 910, 917 (4th Cir. 1995).* Plaintiffs' motion for leave to file the proposed amended complaint is futile because even if it were allowed, the case would still be moot and because it is based on an outdated, and therefore false, state of affairs.

The court finds that all four categories of allegations Plaintiffs wish to add are futile and should not be allowed. First, the allegations concerning the application [*35] of the 2003 non-discrimination policy to AIO and other student organizations prior to the inception of this lawsuit do not change the current situation between these parties, [23] which was fundamentally altered by the announcement and application of the 2005 Policy. Second, the allegations concerning Defendants' failure to commit fully to the 2005 Policy are simply no longer true and are, therefore, irrelevant and insufficient to save the case from mootness. [24] [*36] Third, Plaintiffs' single allegation that the 2005 Policy is "vague" is rejected by the court, as addressed in Part I(B) of this opinion, supra. [25] Finally, the court in its discretion will not allow the continuation of a lawsuit merely to allow Plaintiffs to seek nominal damages, which, even if proven, would be limited to one dollar. *Carey v.*

---

[22]  Plaintiffs filed their motion on June 20, 2005.

[23]  No other student organizations are parties to this lawsuit.

[24]  The proposed amended complaint was filed at a time of flux, before UNC-CH had updated all of the relevant websites, links and templates with the 2005 Policy and before Plaintiffs had applied for and received official recognition. The situation then, as reflected in Plaintiffs' proposed amended complaint, is not the situation now. If this court were to allow an amendment stating allegations all parties now know to be false, it would not serve the interests of justice or efficiency. See also Part I(A) of this opinion, supra.

[25]  Plaintiffs' proposed amended complaint says almost nothing about the 2005 Policy, but does make one allegation that the policy is "vague in its terms," when viewed as "supplementing the university nondiscrimination policy regime." (Proposed Am. Compl. P89.) Plaintiffs' vagueness argument assumes that the 2003 Policy is also still operational and that the two contradictory policies must somehow be reconciled. This is no longer the case, as UNC-CH has now completely removed the 2003 Policy, in favor of the 2005 Policy.

*Piphus, 435 U.S. 247, 267, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978)*. [26]

[*37]  C. <u>Relative Prejudice to Parties</u>

In deciding whether to allow amendments under Rule 15, courts must weigh the prejudice which would be suffered by the non-moving party if leave were granted against any harm which would be suffered by the moving party if leave were denied. *Foman, 371 U.S. at 182* (leave to amend may be denied when the prejudice to the non-moving party outweighs any harm to the moving party if leave is denied); *Forstmann, 114 F.R.D. at 87*. "Prejudice resulting to the opponent by a grant of leave to amend is reason sufficient to deny amendment." *Davis v. Piper Aircraft Corp. 615 F.2d 606, 613 (4th Cir. 1980)* (citing *Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971))*.

In this case. Plaintiffs suffer no harm from the denial of their motion to amend. There are no concerns about the statute of limitations or a need to "relate back" pursuant to Fed. R. Civ. P. 15(c). Plaintiffs are not currently suffering injury. They have what they sought - official university recognition - and the status quo is to their benefit. If Plaintiffs, future members [*38]  of AIO, or members of other student organizations are injured in the future, under the 2005 Policy or otherwise, they are free to bring a lawsuit and seek redress at that time.

In contrast, Defendants would be prejudiced if leave to amend were granted and the lawsuit were permitted to continue. Defendants voluntarily met the demands of Plaintiffs by issuing the 2005 Policy and granting AIO official recognition. Plaintiffs have been enjoying the benefits of that status and Defendants are justified in expecting the lawsuit to reach its end. Thus, the balance of harm weighs against granting leave to amend.

D. <u>Judicial Economy</u>

The motion to amend should also be denied in the interest of preserving judicial resources and serving efficient case management. *Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)* ("The burden to the judicial system can justify a denial of a motion to amend 'even if the amendment would cause no hardship at all to the opposing party.'") (citation omitted); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc., 690 F.2d 1157, 1163 (5th Cir. 1982)* (court should consider judicial economy and whether amendment would lead to expeditious [*39]  disposition of litigation on merits). Without a current controversy or injury for which the court can offer redress, it would be a waste of judicial resources to allow the proposed amendments and continue the court's involvement.

Among the proposed amended complaint's most prominent flaws are the allegations that Plaintiffs are currently suffering denial of official recognition and that UNC-CH has not officially, clearly and completely replaced its 2003 non-discrimination policy with the 2005 Policy. As discussed <u>supra,</u> those allegations are both false and pivotal. If the court were to allow the proposed amended complaint, it would be forcing the litigation of issues mooted by the progress and compromise made by the parties since the March 2, 2005 Order.

It is manifestly more efficient for the parties to continue their mutually-satisfactory relationship, without interference from the court. The 2005 Policy is the policy of UNC-CH now. So far, the parties have been able, in the spirit of compromise and good faith, to coexist under that policy. The

---

[26]   In order to recover nominal damages, Plaintiffs would have to prevail on the merits of their case. Farrar v. Hobby, 506 U.S. 103, 112, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992) (nominal damages are appropriate when civil rights plaintiff establishes violation of his due process rights, but is unable to prove actual injury); Brister v. Faulkner, 214 F.3d 675, 685-86 (5th Cir. 2000) (civil rights plaintiffs not entitled to nominal damages where court found that their constitutional rights had not been violated). Here, Plaintiffs have not proven a constitutional violation and the case is dismissed as moot, so that possibility is foreclosed.

courts are open to address any actual controversy which may arise concerning the 2005 Policy in the future, but this court should not [*40] retain jurisdiction over the parties indefinitely, in anticipation of a new injury.

For these reasons, the Motion for Leave to File Amended Complaint will be denied.

III. Plaintiffs Not Entitled to Recover Costs and Attorneys' Fees

Plaintiffs seek recovery of their costs and expenses, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and "other applicable law." [27] (Compl. 21.) In order to recover costs and attorneys' fees, Plaintiffs must qualify as "prevailing parties." Fed. R. Civ. P. 54(d)(1); 42 U.S.C. § 1988(b). Even then, it is in the court's discretion whether to award attorneys' fees.

The court recognizes that Plaintiffs' lawsuit and this court's March 2, 2005 Order were likely catalysts toward UNC-CH's [*41] decision to announce the 2005 Policy and grant AIO official recognition. Nevertheless, the United States Supreme Court and the Fourth Circuit have rejected the "catalyst theory," "which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 601, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001)*. The Supreme Court said the following:

> Petitioners . . . assert that the "catalyst theory" is necessary to prevent defendants from unilaterally mooting an action before judgment in an effort to avoid an award of attorney's fees. They also claim that the rejection of the "catalyst theory" will deter plaintiffs with meritorious but expensive cases from bringing

> suit. We are skeptical of these assertions, which are entirely speculative and unsupported by any empirical evidence . . . .Petitioners discount the disincentive that the "catalyst theory" may have upon a defendant's decision to voluntarily change its conduct, conduct that may not be illegal.

*Id. at 608*. Accord *Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 275, 278 (4th Cir. 2002)* [*42] (noting *Buckhannon's* rejection of the catalyst theory and holding that a voluntary, unilateral act is not enough for the opposing party to be said to have prevailed for purposes of Section 1988(b)); *S-1 v. State Bd. of Educ., 21 F.3d 49, 51 (4th Cir. 1994)* (en banc) ("A person may not be a 'prevailing party'. . . except by virtue of having obtained an enforceable judgment, consent decree, or settlement giving some of the legal relief sought").

In rejecting the "catalyst theory," the *Buckhannon* court defined "prevailing party" as a "party in whose favor a judgment is rendered, regardless of the amount of damages awarded . . . .Also termed *successful party.*" *532 U.S. at 603*. In other words, "'Liability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against, that defendant.'" *Farrar v. Hobby, 506 U.S. 103, 109, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)* (quoting *Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985))*.

Here, there was no winner and no loser. The parties have reached common ground, [*43] due to Defendants' voluntary issuance of the 2005 Policy (albeit with prodding from the court), Plaintiffs' willingness to apply for official recognition under that policy, and Defendants' granting of official recognition to AIO. The only

---

[27] Plaintiffs presumably mean to invoke the cost-shifting provisions of Fed. R. Civ. P. 54(d)(1), which require an award of costs to the "prevailing party."

court-sanctioned relief Plaintiffs recovered was a preliminary injunction, which is insufficient to qualify Plaintiffs as "prevailing parties" for purposes of Section 1988(b). *Smyth, 282 F.3d at 277*. [28] **[*44]** Plaintiffs neither sought nor were granted damages, not even nominal damages. [29] Plaintiffs did not even secure a settlement agreement enforceable by a consent decree, since Defendants did not condition their actions on Plaintiffs' agreement to dismiss their claims. [30] Defendants did not force Plaintiffs to go to trial and win a verdict in their favor and there was no decision on the merits of the case. [31]

**[*45]** Instead, Defendants voluntarily gave Plaintiffs what they asked for and are now in the unusual position of having to convince Plaintiffs to accept victory. Defendants have a right to bring this case to an end by changing or clarifying the policy in order to avoid further alleged injury to or controversy with Plaintiffs. This should be encouraged, not discouraged.

For the foregoing reasons, Plaintiffs are not "prevailing parties" under Rule 54(d)(1) or Section 1988(b) and are not entitled to an award of costs or attorneys' fees thereunder. In the absence of a statutory basis for the recovery of Plaintiffs' costs and fees, the "American Rule" applies and the parties must bear their own costs and expenses. *Buckhannon, 532 U.S. at 602*.

CONCLUSION

Plaintiffs filed this lawsuit as outsiders, challenging the university system, and end this lawsuit as insiders, fully participating in the university system. The claims of the original complaint are moot and the court will not allow Plaintiffs to morph it into a new case, via belated amended allegations about harm that Plaintiffs or other student groups might suffer in the future.

For the reasons set forth above, the court **[*46]** will grant Defendants' Second Motion to Dismiss and Suggestion of Mootness and will deny Plaintiffs' Motion for Leave to File Amended Complaint. The parties will bear their own costs.

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

Frank W. Bullock Jr.

United States District Judge

May 4, 2006

ORDER

BULLOCK, District Judge

For the reasons set forth in the memorandum opinion filed contemporaneously herewith

IT IS ORDERED that Plaintiffs' Motion for Leave to File Amended Complaint [Doc. #44] is **DENIED.**

---

[28]   The <u>Smyth</u> opinion explains that the frame-work used to decide whether to grant interim relief turns on the relative harm the parties "would be likely to suffer absent an injunction" and a decision to grant a preliminary injunction "by no means represents a determination that the claim in question will or ought to succeed ultimately." <u>Id. at 276-77</u>. Thus, the issuance of interim relief is "an unhelpful guide to the legal determination of whether a party has prevailed" under Section 1988(b). <u>Id. at 277</u>.

[29]   In some circumstances, an award of nominal damages on the merits can be sufficient to qualify the recipient as a "prevailing party" for an award of costs under Rule 54(d)(1) and attorney's fees under Section 1988(b). <u>Buckhannon, 532 U.S. at 603-04</u>; <u>Zeuner v. Rare Hospitality Int'l, Inc., 386 F. Supp. 2d 635, 639-40 (M.D.N.C. 2005)</u>. However, Plaintiffs did not prevail on the merits of any of their claims and Plaintiffs' claim for attorneys' fees is insufficient to keep this case alive. See discussion in footnote 19, <u>supra</u>.

[30]   <u>Contrast Buckhannon, 532 U.S. at 604</u> ("we have held that settlement agreements enforced through a consent decree may serve as the basis for an award of attorney's fees").

[31]   <u>Contrast Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 352 (4th Cir. 2001)</u> ("In this case, there was no voluntary change in CMS's conduct. CMS clung to the desegregation orders and put up a vigorous defense in the course of a two-month trial. A final judgment was handed down, and any change in CMS's behavior will be due to the district court's decree, not a voluntary act.").

2006 U.S. Dist. LEXIS 28065, *46

IT IS FURTHER ORDERED that Defendants' Second Motion to Dismiss and Suggestion of Mootness [Doc. #39] is **GRANTED,** and this action is **DISMISSED.** The parties shall bear their own costs.

Frank W. Bullock Jr.

United States District Judge

May 4, 2006